**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harry O. STRATTON, William D. Riggs
and Loy Z. Harrell,
Defendants-Appellants.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Samuel S. SMITH, Defendant-Appellant.**

Nos. 78–5586, 78–5589.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 6, 1981.

As Modified on Denial of Rehearing and
Rehearing En Banc Oct. 5, 1981.

Harry W. Meshaw, Jr. (Court-appointed), Atlantic Beach, Fla., for Stratton.

Richard L. Brown (Court-appointed), Boca Raton, Fla., for Riggs.

Daniel D. Richardson (Court-appointed), Jacksonville, Fla., for Harrell.

John J. Daley, Jr., Curtis S. Fallgatter, Asst. U. S. Attys., Jacksonville, Fla., John F. Depue, Appellate Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

James L. Harrison, Jacksonville, Fla., for defendant-appellant Smith.

Before GOLDBERG, AINSWORTH and GARZA, Circuit Judges.

GOLDBERG, Circuit Judge:

We are faced today with what is both substantively and procedurally a *rara avis* in the covey of federal cases. A Florida state court judge—a man charged with upholding our nation's laws—together with his bailiff and two other individuals, has been convicted of converting his office into a nest of bribery and corruption. During the trial of these men, the district judge made several unusual procedural rulings in an effort to keep the entire flock of defendants together in a single proceeding. We find that the indictment in this case was substantively sufficient to meet legal requirements and that the evidence presented was adequate to establish the government's prima facie case. We therefore deny appel-

lants' request to reverse and to order dismissal of the charges. However, we hold that the procedures followed by the district court in conducting this complex and difficult litigation were inadequate to preserve appellants' constitutional rights. We therefore reverse the convictions of each defendant and remand for a new trial.

## I. BIRDS OF A FEATHER ...?

The indictment in the case at bar charges that each of nine defendants participated in "a pattern of racketeering activity" involving the "court and law enforcement system of the Third Judicial Circuit of the State of Florida," and that several of the defendants also obstructed justice and criminal investigations in an effort to cover up the racketeering activities. With a broad brush, the indictment paints a picture of unscrupulous state court judges surrounded by equally unscrupulous court employees, attorneys and citizens, all of whom engaged in the practice of buying and selling "justice."[1] In examples too numerous to recount, the

indictment cites instances in which various defendants were involved in such offenses as bribery, manipulation of grand juries, protection of illegal activities, and threats against prospective witnesses. In short, the indictment alleges that instead of doing justice, one arm of the Florida court system was undoing it.

Count One of the indictment alleges that Florida judges Samuel S. Smith ("Smith") and William Arvel Drury ("Drury"), court bailiff Loy Zell Harrell ("Harrell"), public defender investigator Grover Lamar Lee ("Lee"), attorneys Terry R. McDavid ("McDavid") and Arthur K. Black ("Black"), and Florida residents William D. Riggs ("Riggs"), Harry O. Stratton ("Stratton"), and Conlon St. John Wilmott ("Wilmott"), conspired to participate in "a pattern of racketeering activity" involving Florida's Third Judicial Circuit in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d).[2] A common scenario of the rack-

---

1. Apparently "justice" was not the only commodity for sale. Paragraphs 8 and 9 of Count 1 allege that four of the defendants bribed various officials in order to obtain seized marijuana.

2. 18 U.S.C.A. § 1962 (West Supp.1981) provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or

in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

Under 18 U.S.C.A. § 1961 (West Supp.1981), "racketeering activity" is defined as

(A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472 and 473 (relating to counterfeiting), section 659 (relat-

eteering activity alleged as part of this conspiracy was the payment of monetary bribes to Judge Smith—both directly and through court employees—in return for the protection of illegal activities and for favorable treatment in court. Count One also alleges a total of 72 "overt acts" in furtherance of the conspiracy. Count Two of the indictment charges Judge Smith and Bailiff Harrell with substantive violations of RICO, including soliciting and receiving bribes, and purchasing confiscated marijuana from state officials. 18 U.S.C. § 1962(c). Counts Three, Four, Five and Twelve charge Riggs with obstruction of justice for his attempt to cover up the racketeering conspiracy, and Counts Eight, Nine and Ten allege similar charges against Black, Smith and Wilmott, respectively. 18 U.S.C. § 1503.[3] Counts Six and Seven charge Smith, Drury, Black, Riggs and Stratton with obstructing criminal investigations of the racketeering activity. 18 U.S.C. § 1510.[4] Finally, Count Eleven charges

ing to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section. 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States. . . .

A " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering;" 18 U.S.C.A. § 1961(5) (West Supp.1981).

3. 18 U.S.C.A. § 1503 (West 1966) provides:
Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

4. 18 U.S.C.A. § 1510 (West Supp.1981) provides:
(a) Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator; or
Whoever injures any person in his person or property on account of giving by such person or by any other person of any such information to any criminal investigator—
Shall be fined not more than $5,000, or imprisoned not more than five years, or both.
(b) As used in this section, the term "criminal investigator" means any individual duly authorized by a department, agency, or arm-

Wilmott with bribery of public officials and witnesses." 18 U.S.C. § 201(d).[5]

Although the above indictment was returned in the Middle District of Florida, the trial took place in the Eastern District of Louisiana following a change of venue granted pursuant to a motion made by some—but not all—defendants. Before trial, Wilmott and Black were severed from the case, and after the prosecution presented its case-in-chief, the district court granted a directed verdict of acquittal in favor of Judge Drury. The cases of the six remaining defendants were then presented to the jury.

During the presentation of his defense, Judge Smith was hospitalized due to a severe heart ailment. When it was determined that Smith might have been unavailable for trial for some time, his case was severed from that of the remaining defendants. The jury continued to hear evidence on the conspiracy and other charges, and subsequently returned verdicts with regard to each of the five remaining defendants. McDavid and Lee were acquitted. Riggs and Stratton were convicted on all counts. Harrell was convicted on Count One but acquitted on Count Two. After Judge

Smith recovered from his ailment, his trial was completed before the same jury which had convicted three of his codefendants. Smith was convicted on Counts One, Two and Nine, but was acquitted on Count Six.

The four defendants who were found guilty—Smith, Harrell, Riggs and Stratton—brought this appeal.[6] Appellants allege numerous errors, some of which, if valid, would require reversing their convictions and dismissing various parts of the indictment, and others of which, if valid, would require reversing their convictions and remanding for new trials. We deal first with the former group of issues, and then with the latter.

## II. THE PIGEON COOP: "ENTERPRISE" UNDER RICO

Judge Smith was convicted under Count Two of violating RICO by participating in and conducting the affairs of an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce," through a pattern of racketeering activity. 18 U.S.C. § 1962; see pages 1070–1071 & note 2, *supra*. In addition, all four appellants were convicted under Count One of conspiring to violate RICO.[7] 18 U.S.C. § 1962; see pages

ed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States.

**5.** 18 U.S.C.A. § 201(d) (West 1969) provides criminal penalties for:

Whoever, directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom. . . .

Counts Two, Six and Seven also alleged violations of 18 U.S.C.A. § 2 (West 1969), which provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**6.** Prior to oral argument, appellant Riggs' attorney, Richard Lovett Brown, moved several times to withdraw as counsel, and each time his motion was denied. Mr. Brown's most recent attempt to remove himself from the case was filed with this court ten days before the appeal was to be orally argued, and this panel denied the request one week before oral argument. Nevertheless, Mr. Brown did not appear at oral argument and has offered no reason for his absence. Mr. Brown's conduct in ignoring an order of this court and failing to represent his client is professionally and morally reprehensible. Since we reverse and remand with regard to all four appellants in this case, Mr. Brown's absence was not prejudicial to his client. However, there is no doubt that it was both unethical and irresponsible.

**7.** "To be convicted of conspiracy to violate RICO there must be proof that the individual, by his words or actions, objectively manifested

1070–1071 & note 2, *supra.* In both counts, the "enterprise" was defined as the Third Judicial Circuit of the State of Florida. All four appellants argue that for a number of reasons the Third Judicial Circuit cannot constitute an enterprise as defined under RICO, and that the indictment is therefore insufficient as a matter of law.

Appellants first argue that Florida's Third Judicial Circuit is too broad an entity to properly constitute a RICO enterprise. Appellants suggest that the Third Judicial Circuit is simply a "geographical designation" encompassing a number of Florida state courts and law enforcement agencies. Because the government chose such a broad enterprise in the case at bar, appellants conclude that they were not adequately apprised of the charges against them. This argument mischaracterizes the indictment in the case at bar. An indictment is sufficient if (1) it contains "the elements of the offense charged and fairly informs the defendant of the charge against which he must defend," and (2) it enables the accused "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 636, 62

L.Ed.2d 575 (1980); *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *see United States v. L'Hoste,* 609 F.2d 796, 800 (5th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). The indictment in this case is clearly adequate under the above standard. The agreements which were part of the alleged conspiracy, the "overt acts" in furtherance of the conspiracy, and the substantive racketeering offenses are all related in great detail. With painstaking particularity, the indictment makes it clear that the alleged conspiracy and substantive offenses centered around the Third Judicial Circuit as an arm of the Florida court system, and not as a mere "geographical designation" as argued by appellants. Moreover, the indictment alleges that the offenses were all part of a single scheme to use the Third Judicial Circuit for illicit profit-making activities and to cover up these illegal activities. The indictment leaves no room for doubt regarding the charges lodged against each defendant, and offers each defendant protection against double jeopardy. Appellants' argument that the indictment is too broad to be sufficient is therefore without merit.[8]

an agreement to participate, directly or indirectly, in the affairs of the enterprise, through the commission of two or more predicate crimes." *United States v. Bright,* 630 F.2d 804, 834 (5th Cir. 1980); *accord, United States v. Elliott,* 571 F.2d 880, 903 (5th Cir. 1978), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1979).

8. Appellants argue that by defining the enterprise very broadly, the government could combine totally unrelated agreements and overt acts in a single conspiracy. Appellants' argument raises valid concerns. For example, assuming that our own court—the United States Court of Appeals for the Fifth Circuit—was alleged to be the enterprise (as we assume would be proper under our analysis), we question whether an agreement to bribe a court official in El Paso, Texas could be part of the same conspiracy as an unrelated agreement to use a judicial office for illicit profit-making purposes in Fort Lauderdale, Florida, when neither the El Paso nor the Fort Lauderdale conspirators knew of the existence of the other group. However, we need not reach this issue in the case at bar, since Count One of the indictment makes it clear that the bribery and other illegal agreements were part of a single

overall scheme, and that the leading characters in the conspiracy knew of the others' illegal activities, and, indeed, conspired with one another in furtherance of the illegal activities of the enterprise. Each conspiracy agreement, overt act and substantive offense charged in the indictment is either alleged to be part of the overall scheme, or part of the activity designed to cover up the scheme. Moreover, as alleged in the indictment, the common thread running through each of the particularized components of the conspiracy is Judge Samuel Smith's use of his office for illegal profit-making activity. It is therefore insignificant that some of those who paid bribes in this scheme might not have known about other illegal activities which were part of it. The agreements alleged in the indictment are sufficiently connected to constitute a single RICO conspiracy.

Because of this interrelationship between the conspiracy components, overt acts and substantive offenses charged in the indictment, appellants' claim that the indictment must be dismissed for prejudicial joinder of offenses and/or parties also is without merit. *See Bright, supra,* 630 F.2d at 812–13.

Appellants next contend that by broadly defining the enterprise as Florida's Third Judicial Circuit, the government has improperly charged multiple conspiracies under the guise of a single conspiracy. Appellants argue that each agreement to bribe a judge or court official, or to use a public office for illegal profit-making activity, constituted a separate conspiracy. Since some coconspirators had no knowledge of all the illicit agreements, appellants suggest that the government cannot charge a single conspiracy in a single count. Appellants' argument misconstrues the nature of a RICO conspiracy. The gravamen of a RICO conspiracy charge "is that each [defendant] agreed to participate, directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes." *Elliott, supra,* 571 F.2d at 902. Under RICO it is irrelevant whether "each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs." *Id.* As noted above, in the case at bar, the indictment charged and the evidence indicated that the defendants participated in a single scheme of racketeering activity involving Florida's Third Judicial Circuit. Because the indictment properly defined the enterprise as Florida's Third Judicial Circuit, and properly alleged a single pattern of racketeering activity, we have no doubt that Count One properly charged a single conspiracy.[9] As in *United States v. Bright, supra,* 630 F.2d at 812–13, "if this [were] not a RICO case," the appellants might well have a valid argument. However, under RICO "diverse parties and crimes" are tied together through the concept of the illegal enterprise.[10] *See Elliott, supra,* 571 F.2d at 902. In short, because each of the agreements and "overt acts" alleged in the indictment was designed to further a pattern of racketeering activity involving a properly defined RICO enterprise, a single conspiracy was properly charged.

Appellants also suggest that since the Third Judicial Circuit is a government entity, it cannot constitute a RICO enterprise. We disagree. 18 U.S.C.A. § 1961(4) (West Supp.1981) defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[11] It is well-settled that this definition is broad enough to include government departments and agencies such as Florida's Third Judicial Circuit. *Cf. United States v. Bacheler,* 611 F.2d 443 (3d Cir. 1979) (city Traffic Court); *Bright, supra,* 630 F.2d at 829 (sheriff's office); *United States v. Brown,* 555 F.2d 407 (5th Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (city police department); *United States v. Altomare,* 625 F.2d 5 (4th Cir. 1980) (county prosecutor's office);

---

9. *See* note 8 *supra.*

10. Appellants' reliance on cases distinguishing single and multiple conspiracies under the "wheel" and "chain" notions of conspiracy, *see Elliott, supra,* 571 F.2d at 900–902, is misplaced, since RICO replaces the conceptual devices of "wheels" and "chains" with the "enterprise." *Id.* at 902. Hence, as long as "each crime was intended to further the enterprise's affairs," *id.* at 902–03, and as long as the enterprise properly comprises a pattern of racketeering activity, *see* note 8 *supra,* a single conspiracy is charged under RICO. "To find a single conspiracy, we still must look for agreement on an overall objective. What Congress did was to define that objective [*i. e.,* to further the enterprise's affairs] through the substantive provisions of the Act." *Elliott, supra,* 571 F.2d at 903.

11. The concept of a corrupt enterprise is not an unfamiliar one, and has been the theme of a number of popular motion pictures. The classic film in this regard is *On the Waterfront,* a 1954 production in which Terry Malloy (Marlin Brando), bolstered by the love of Edie Doyle (Eva Marie Saint) and the friendship of Father Barry (Karl Malden), testifies against a corrupt waterfront union headed by "Johnny Friendly" Skelley (Lee J. Cobb). Other examples of this theme in motion pictures include *Serpico,* starring Al Pacino (corrupt police department), *Brubaker,* starring Robert Redford (corrupt prison system), and *All the President's Men,* starring Robert Redford and Dustin Hoffman (corrupt executive branch of U.S. government).

United States v. Karas, 624 F.2d 500 (4th Cir. 1980), cert. denied, —— U.S. ——, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981) (county law enforcement office); *United States v. Baker*, 617 F.2d 1060 (4th Cir. 1980) (sheriff's department); *United States v. Grzywacz*, 603 F.2d 682 (7th Cir. 1979), cert. denied, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (Gewin, J., sitting by designation) (city police department); *United States v. Frumento*, 563 F.2d 1083 (3rd Cir. 1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978) (State Bureau of Cigarette and Beverage Taxes); *United States v. Dozier*, 493 F.Supp. 554 (M.D.La.1980) (State Department of Agriculture); *United States v. Sisk*, 476 F.Supp. 1061 (M.D.Tenn. 1979) (state governor's office); *United States v. Barber*, 476 F.Supp. 182 (S.D. W.Va.1979) (State Alcohol Beverage Control Commissioner's Office); *United States v. Vignola*, 464 F.Supp. 1091 (E.D.Pa.), aff'd, 605 F.2d 1199 (3d Cir. 1979), cert. denied, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980) (city Traffic Court). But cf. *United States v. Mandel*, 415 F.Supp. 997 (D.Md.1976) (State of Maryland not an enterprise under RICO).

■ Moreover, there is no merit to appellants' suggestion that the prosecution must specify whether the enterprise is either a "legal entity" or "a group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4) (West Supp. 1981) requires only that the enterprise be either a legal entity *or* a group associated in fact; there is no logical or statutory reason to force the government to choose between alternative enterprise theories, *see Brown*,

supra, 555 F.2d at 415 (Macon Police Department is at least a group associated in fact and may also be a legal entity; *Baker, supra*, (county sheriff's department is either a legal entity or a group of individuals associated in fact), as long as the indictment is otherwise sufficient.

■ Appellants also argue that the requisite nexus with interstate commerce was not shown in the case at bar, because the government presented no evidence directly linking the activities of the coconspirators with interstate commerce. However, RICO requires only that the activities *of the enterprise* be connected with interstate commerce. *United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); accord, *United States v. Nerone*, 563 F.2d 836, 850–51 (7th Cir. 1977), cert. denied, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978); *Vignola, supra*, 464 F.Supp. at 1097. Since we find that Florida's Third Judicial Circuit properly constituted an enterprise under RICO, and since the record contains more than ample evidence of the Third Judicial Circuit's connection with interstate commerce,[12] appellants' claim is without merit.

■ The indictment in the case at bar properly alleged the RICO enterprise to be Florida's Third Judicial Circuit, properly charged a single conspiracy, and properly alleged the requisite connection to interstate commerce. Appellants' claim that the indictment is defective and must be dismissed is therefore without merit.[13]

---

12. For example, evidence was presented that out-of-state litigants appeared before the Third Judicial Circuit, Transcript at 3177–78, 6896–98, that the Third Judicial Circuit state attorney was at times involved in extradition proceedings, Transcript at 6896–98, and that the Third Judicial Circuit Clerk's Office purchased office supplies from outside the state, Transcript at 764, 1817.

13. Appellant Riggs suggests that the language used in the indictment is insufficient to properly allege the element of specific intent. However, in *United States v. Haas*, 583 F.2d 216, 219–21 (5th Cir. 1978), cert. denied, 440 U.S.

980, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979), this court held that the words "corruptly did endeavor to"—the language used in the indictment in the case at bar—was indeed sufficient to allege a knowing, intentional and willful act. Hence, the indictment's language in this case sufficiently alleged the specific intent element.

We have considered appellants' remaining arguments which would mandate dismissal of the charges against them—including the claim that the government's evidence was insufficient to sustain convictions for the offenses charged—and find them to be without merit.

## III. FLYING WEST FOR THE WINTER: THE CHANGE OF VENUE

The indictment of two judges and various other public servants understandably generated considerable publicity in the Middle District of Florida, the district in which the crimes were allegedly committed. Consequently, defendants Smith and Black filed motions to transfer the trial to another district on the grounds that they would be unable to obtain a fair trial in the Middle District of Florida. Appellant Riggs adopted the motions of his codefendants. However, appellant Harrell expressly refused to adopt the motions, while appellant Stratton's counsel, noting that "I know of no grounds to object to [the change of venue] motions," stated that his client stood "neutral." *See* Record, Volume 33 at 4–10. Despite the fact that not all defendants were in favor of a change of venue, the trial court granted the motions made by Smith and Black and changed the situs of the trial from the Middle District of Florida (at Jacksonville) to the Eastern District of Louisiana (at New Orleans).[14] Defendant Harrell subsequently asked for a severance, asserting his constitutional right to be tried in the state and district in which the alleged crime was committed, but the trial court denied Harrell's motion. On appeal, both Harrell and Stratton argue that their constitutional rights were abridged by the change of venue without their consent.

■ Article III, section 2, clause 3 of the United States Constitution provides that "The Trial of all Crimes, except in Cases of Impeachment, shall be ... held in the State where the said Crimes shall have been committed...." The Sixth Amendment expands this rule and expresses it as a right of the accused by providing that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of *the state and district wherein the crime shall have been committed* ..." U.S.Const. amend. VI (emphasis added). The Federal Rules of Criminal Procedure help to preserve this important constitutional right[15] by providing that "[e]xcept as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed." Fed.R.Crim.P. 18. Because of this constitutional right, Fed.R.Crim.P. 21(a) "conditions a change of venue ... upon the defendant's request therefor. Absent the request, a change of venue may not be ordered." *United States v. Abbott Laboratories*, 505 F.2d 565, 572 (4th Cir. 1974) (citation omitted), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 671 (1975); *see United States v. Means*, 409 F.Supp. 115 (D.S.D.1976); *United States v. Holder*, 399 F.Supp. 220 (D.S.D.1975); *see also Margoles v. United States*, 407 F.2d 727 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). A defendant therefore cannot be forced to accept a change of venue against his will. *Abbott Laboratories, supra*, 505 F.2d at 572.

In the case at bar, the government concedes that each defendant has the constitutional right to be tried in the state and district where the crime has been committed, but suggests that this right is not absolute. The government notes that the widespread pretrial publicity in this case would have jeopardized defendants' right to a fair trial had the venue not been changed. Since certain defendants moved for a change of venue, and since the trial judge properly granted this motion based on pretrial publicity, the government points out that the only way to have protected the other defendants' right to be tried in the state and district where the crime was committed would have been to order a severance and separate trials. Because of the complexity of the case at bar, the government suggests that interests of judicial economy required the trial court to follow the route chosen below.

---

14. The distance between Jacksonville and New Orleans is approximately 500 miles as the crow flies, and nearly 600 miles by interstate highway.

15. A defendant's "interest in being tried only in a district where venue properly lay" clearly constitutes a "substantial" right. *United States v. Durades*, 607 F.2d 818 (9th Cir. 1979).

We disagree. While the trial court may well have been nobly motivated by the conclusion that "the fairest place for all these defendants was a joint trial before jurors outside the Middle District of Florida," Brief for the United States at 21, the decision to change venue with regard to all defendants went beyond the province of the trial court. It is for the defendant and his attorney to determine whether adverse pretrial publicity is so pervasive that the defendant should waive his right to be tried in the state and district in which the alleged crime was committed. The court does not have the option of waiving this right on behalf of the defendant and transferring venue, even if the trial judge sincerely believes that such action would be for defendant's own good. Moreover, while the government may be correct in arguing that a defendant's venue right is not absolute, interests of judicial convenience and economy clearly cannot outweigh this fundamental constitutional right. A defendant's right to be tried in the state and district in which the crime was allegedly committed cannot be cast by the wayside simply because his case is a complex one involving several defendants. Using as powerful a magnifying glass as we have, we can find no judicial economy exception between the lines of the Sixth Amendment. Unless appellants Harrell and Stratton each waived his venue right in the case at bar, the trial court's change of venue clearly abridged an important constitutional right.

As noted above, the right to be tried in the state and district where the crime was alleged to have been committed may be voluntarily waived by the defendant. *United States v. Marcello,* 423 F.2d 993, 1001–06 (5th Cir.), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970). The "essential factors" in determining whether a defendant has waived his constitutional venue right are "knowledge of the right, the free exercise of an uncoerced will, and conduct or action known to the accused which evidences an intent to waive." *Id.* at 1004. In *Marcello,* the defendant affirmatively moved for a change of venue, but subsequently failed to vigorously press his motion. However, at no time did the defendant withdraw his change of venue motion. This court held that under such circumstances the district court was justified in ordering a change of venue and was not required to withdraw its order when subsequently asked to do so by the defendant.

Applying the above standard to the case at bar, it is clear that neither defendant Harrell nor defendant Stratton knowingly and voluntarily waived his right to be tried in the state and district in which the crime was alleged to have been committed. Harrell expressly noted that he refused to adopt his codefendants' motions to change venue, thereby giving express notice to the trial court that he did not choose to waive his venue right. Moreover, after his codefendants' change of venue motions were granted, Harrell made his position even clearer by moving for a severance in order to protect his constitutional right to be tried in the state and district in which the crime was alleged to have been committed. Although the facts with regard to defendant Stratton differ slightly, a careful reading of the record reveals that like Harrell, Stratton never waived his venue right. When asked whether he adopted his codefendants' motions to change venue, Stratton's attorney answered that he stood "neutral," since he knew "of no grounds to object to [the change of venue] motions." This remark makes it clear that Stratton did not knowingly and voluntarily waive the venue right as required by *Marcello, supra.* An attorney who announces that he knows of no grounds on which to object to a change of venue motion—*i. e.,* an attorney who makes it clear that he is ignorant of his client's right to demand a trial in the state and district in which the crime was allegedly committed—cannot knowingly and voluntarily waive his client's venue right. Since valid waivers of fundamental constitutional guarantees " 'not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences,' " *In re Bryan,* 645 F.2d 331, at 333 (5th Cir.

1981), *quoting Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970), it is clear that neither defendant Harrell nor defendant Stratton waived his venue right in the case at bar.[16]

The cases which stand for the proposition that an objection to venue is waived by the defendant's failure to object to the improper venue prior to trial, *see, e. g., United States v. Menendez*, 612 F.2d 51, 54–55 (2d Cir. 1979); *United States v. Boney*, 572 F.2d 397 (2d Cir. 1978); *Kitchen v. United States*, 532 F.2d 445 (5th Cir. 1976); *United States v. Dryden*, 423 F.2d 1175, 1178 (5th Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970), do not support the government's argument in the case at bar. While in many (and perhaps most) cases in which the defendant fails to object to a defect in venue, the defendant's silence may be taken to imply a waiver of the venue right, in the case at bar more than mere silence must be taken into account. As noted above, both defendant Harrell's attorney and defendant Stratton's attorney made statements which preclude the conclusion that their clients "knowingly and voluntarily" waived the right to be tried in the state and district in which the crime was allegedly committed. Defendant Harrell's attorney clearly expressed an objection to the proposed change of venue, while defendant Stratton's attorney clearly expressed his ignorance of the right. A knowing and intelligent waiver of these defendants' venue rights cannot be inferred from the facts of this case.[17]

The government makes much of the fact that defendant Stratton's attorney—ap-pointed late in the case—adopted the previously made motions of his codefendants as a matter of expediency. The government suggests that Stratton therefore moved for a change of venue through his codefendants and that his "neutral" stance at the venue hearing was simply a failure to withdraw this adopted motion. Such a characterization of the facts would make Stratton's case similar to that of the defendant in *Marcello, supra*, a case in which this court held that a defendant who moves for a change of venue and subsequently fails to vigorously press the motion but also fails to withdraw it, cannot object to a change of venue. However, the government's argument mischaracterizes the facts of this case. While it is true that Stratton's attorney adopted those motions of the other defense attorneys made prior to his appointment as counsel, the government admits that the change of venue motions were made *after* this adoption. Hence, the change of venue motions could not have been included within the motions adopted by Stratton's attorney. Indeed, by the time of the venue motions, Stratton's attorney was an active participant in the trial on behalf of his client. Hence, it is clear that Stratton never adopted the motions to change venue. The neutral stance taken by Stratton's attorney at the venue hearing was therefore not a failure to withdraw a change of venue motion as in *Marcello*, but was rather a failure to move for change of venue in the first place. Coupled with the comments evidencing Stratton's attorney's ignorance of the venue right, the "neutral" change of venue position did not give the trial court the discretion to change the case's venue with regard to defendant Stratton.

---

16. "[P]urported waivers of fundamental constitutional guarantees are subject to the most stringent scrutiny." *In re Bryan, supra*.

17. Waiver of objections to venue should not be readily inferred, *see Menendez, supra*, 612 F.2d at 54–55, and in cases like the one at bar in which there is evidence which suggests that the defendant has not waived his venue right, the failure to raise an explicit venue objection cannot imply a waiver. *See United States v. Bowdach*, 414 F.Supp. 1346, 1357 (S.D.Fla.1976), *aff'd*, 561 F.2d 1160 (5th Cir. 1977). In *Bowdach*, the defendant moved for a judgment of acquittal, and failed to raise any express objec-tion to improper venue. Nevertheless, the trial court properly found that no waiver of defendant's venue right could be inferred, since at the time the motion for acquittal was argued, the defense attorney discussed a case dealing with the venue question, and thus the issue of venue "was inherently raised by defendant." *Id.* at 1357. Similarly, in the case at bar "it would be unfair to presume a waiver on the issue of venue," *id.*, since the comments made by both Harrell's attorney and Stratton's attorney suggest that a knowing and voluntary waiver was not contemplated.

The trial court's decision to change the venue of a case with regard to two defendants who had not waived their constitutional right to be tried in the state and district in which the crime charged was alleged to have been committed is both unprecedented and unconstitutional. We shall not put our imprimatur upon such an action. Since neither Harrell nor Stratton implicitly or explicitly waived his venue right, each had the right to be tried in the Middle District of Florida if he so desired. However noble the trial judge's motivation in this case, his decision to change venue with regard to these two defendants was error.

■■■ As an alternative position, the government contends that if the trial judge committed error in his venue decision, this error was harmless. This argument is clearly without merit; in fact, it represents a dangerous attack on the constitution. First, the government conveniently brushes the inconveniences suffered by defendants aside, and virtually ignores the fact that the change of venue forced the defendants to undergo trial in an unfamiliar location hundreds of miles away from the place where the case was initiated, where the defense attorneys' offices and support staffs were located, and where many of the witnesses could be found. The expense and inconvenience of the change of venue in this case were certainly no small matter. In addition—and much more importantly—the government's harmless error argument misconstrues the constitutional violation in this case. Part of the fair trial guaranteed to all Americans by the Constitution is the right to be tried by a jury "of the state and district wherein the crime shall have been committed...." U.S.Const. amend. VI; see page 1076 supra. This fundamental right seeks to ensure the preservation of a certain process—a mode of fair treatment—for all defendants. Absent an implicit or explicit waiver, an abridgement of this right denies the defendant the fundamental fair process guaranteed by the Constitution, and is inherently a harmful error, just as an abridgement of the right to a trial by jury is inherently a harmful error. See Gutman, Academic Determinism: The Division of the Bill of Rights, 54 S.Cal.L. Rev. 295, 355–56 (January 1981). The venue right is not one borne of convenience for defendants,[18] but is rather one borne of fundamental notions of fairness as conceived by our Constitution's framers. Since the venue right is designed to ensure a fundamentally fair process, forcing a defendant against his wishes to undergo a trial in a state or district other than that in which the crime charged is alleged to have been committed is in and of itself harmful. See id. at 355–56.

Neither defendant Harrell nor defendant Stratton waived his constitutional venue right in the case at bar. It was thus error for the trial court to have ordered a change of venue with regard to these two defendants, and the error was harmful. The convictions of both defendants must therefore be reversed and their cases remanded for further proceedings consistent with this opinion.

## IV. ONE FLEW OUT OF THE CUCKOO'S NEST: THE BIFURCATED TRIAL OF DEFENDANT SMITH

While Judge Smith was in the process of presenting his defense at trial, he suffered a severe heart ailment and was hospitalized. Since Smith refused to waive his right to be present at trial, his counsel moved for a severance and/or a mistrial. Once it was determined that Smith's absence might last for about a month, the trial judge granted the requested severance, denied the motion for a mistrial, and continued the case of Judge Smith for later resolution by the same jury. With Judge Smith and his counsel absent from the courtroom,[19] the

---

**18.** The government's observation that a defendant does not have the right to be tried in the district of his residence, see Brief for United States at 24–25, supports the conclusion that the Sixth Amendment's guarantees are not designed simply for the convenience of the defendant.

**19.** As part of the bifurcated trial procedure adopted by the trial court in this case, Smith's

jury heard the remaining defendants present their cases. The jury was instructed that

> [T]he defendant, Samuel S. Smith, is not able to proceed in this trial for physical reasons. He is not now able to do so.
>
> The Court has, therefore, withdrawn, at this time, from your deliberations, consideration of *the ultimate issue of defendant Smith's guilt or innocence. You may consider and determine whether Smith was a member of the conspiracy charged in Count One of the indictment,* if you determine, beyond a reasonable doubt, that the conspiracy charged existed.
>
> *You may also consider whether Smith, knowingly and wilfully, participated in the offense charged in Count Two of the indictment,* if you determine, beyond a reasonable doubt, that the offense took place.
>
> You must not, however, deliberate the ultimate issue of Smith's guilt or innocence until you have received further instructions to do so from the Court.

Transcript at 12,066–67 (emphasis added).

After the close of Smith's codefendants' trial, the jury acquitted defendants McDavid and Lee, convicted defendants Riggs and Stratton on all counts, and convicted defendant Harrell on Count One while acquitting him on Count Two. When defendant Smith had recovered sufficiently to return to trial, he completed the presentation of his case before *the same jury which had convicted three of his codefendants* for their involvement in—and attempt to cover up—a conspiracy centering around Judge Smith's use of his judicial office for illicit

attorney—and his attorney's wife—were excluded from the courtroom during the trial of Smith's codefendants. See Transcript at 11890–915, 11980–84. The reason for this exclusion was apparently the possibility of prejudice to other defendants if jurors saw Smith's counsel—or Smith's counsel's wife—in the courtroom. *Id.*

This incredible ruling lead Smith's counsel to ask the trial judge, "Can I wear a disguise?" Understandably, the harassed trial judge did not answer.

**20.** "One of the most basic rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of

profit-making activity. It is not surprising that the jury found Judge Smith guilty on three of four counts. On appeal, Smith argues that the novel procedure adopted by the trial court clearly abridged his constitutional rights.

## A. The Right To Be Present at Trial

A defendant has a constitutional right to be present at all stages of his trial when his absence might frustrate the fairness of the proceedings.[20] *Faretta v. California,* 422 U.S. 806, 819 n.15, 95 S.Ct. 2525, 2533 n.15, 45 L.Ed.2d 562 (1975); *United States v. Brown,* 571 F.2d 980 (6th Cir. 1978). In addition, Fed.R.Crim.P. 43 guarantees a defendant the right to be present at every stage of trial in federal cases.[21] *See Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v. Benavides,* 549 F.2d 392 (5th Cir. 1977). The abridgement of the right to be present at trial may in some cases constitute harmless error, *see Rogers, supra; Benavides, supra,* but "[w]here there is any reasonable possibility of prejudice from the defendant's absence at any stage of the proceedings, a conviction cannot stand." *Estes v. United States,* 335 F.2d 609, 618 (5th Cir. 1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965). Hence, in many cases finding a defendant's involuntary absence at trial to have been harmless error, the court emphasizes the fact that while the defendant may have been absent, his attorney was present to protect his rights. *See, e. g., United States v. Walls,* 577 F.2d 690 (9th Cir.), *cert. denied,* 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d

his trial." *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). *See generally Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (confrontation and cross-examination of adverse witnesses is a fundamental right); *Gutman, supra,* 54 S.Cal.L. Rev. at 331–56 (analysis of confrontation clause).

**21.** A voluntary absence from trial, or an absence due to defendant's persistence in disruptive conduct "after being warned by the court," does not constitute an abridgement of the right. *See Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); Fed.R.Crim.P. 43.

239 (1978); *United States v. Toliver*, 541 F.2d 958 (2d Cir. 1976); *Estes, supra*, 335 F.2d at 617–18.

■ In the case at bar, the government correctly argues that Smith's absence was technically not an absence during his own trial, since the novel "bifurcated trial" severance ordered by the trial judge created a period during which only Smith's codefendants—and not Smith himself—were on trial. The government reasons that neither Smith nor Smith's counsel had a right to be present at the trial of the codefendants, and that their absence therefore cannot constitute reversible error. The government's argument masks the realities of the trial behind legal technicalities.[22] It is clear that even during his absence, Smith was for all practical purposes "on trial" before the jury which would decide his case. While the trial court's cautionary instruction was careful to order the jury not to reach "the ultimate issue of defendant Smith's guilt or innocence . . . ," the jury was allowed to "consider and determine whether Smith was a member of the conspiracy charged in Count One of the indictment," and to "consider whether Smith, knowingly and wilfully, participated in the offense charged in Count Two of the indictment. . . ." Transcript at 12,066–67; *see* pages 1079–1080 *supra*. Since the focal points of the offenses charged were either racketeering involving Judge Smith's alleged use of his office for illicit purposes, or activities designed to cover up this racketeering, the jury must have considered Judge Smith's involvement when hearing evidence concerning the other defendants and when deliberating on the other defendants' guilt or innocence. The absence of both defendant Smith and his counsel during crucial stages of the trial—including the government's

summation during which the prosecutor referred to Smith a number of times, once calling him "the arch conspirator,"—was for all practical purposes a clear abridgement of the right to be present at trial. Since there is far more than the mere "possibility" of prejudice resulting from this procedure, the trial court's error was not harmless and Smith's conviction cannot stand.

### B. *The Right To Trial By An Impartial Jury*

■ An even more compelling reason that the bifurcated trial of defendant Smith necessitates the reversal of his conviction—and one which does not require us to overlook a legal technicality in favor of the realities of the situation—stems from the defendant's Sixth Amendment right to be tried "by an *impartial* jury." U.S.Const. amend. VI (emphasis added); *see Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). As the Supreme Court has noted, "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *see Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). However, since it would be impractical to require that each juror be completely free from bias in widely publicized cases, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."[23] *Irvin, supra*, 81 S.Ct. at 1643.

■ Applying this standard to the case at bar, it is clear that defendant Smith was

---

**22.** An appellate court should not become bogged down in technicalities by extracting "from episodes in isolation abstract questions of evidence and procedure;" rather, the court should "relive the whole trial imaginatively." *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring); *see United States v. Jacquillon*, 469 F.2d 380, 388 n.1 (5th Cir. 1972), *cert. denied*, 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d

604 (1973); *Sykes v. United States*, 373 F.2d 607, 612 (5th Cir. 1966), *cert. denied*, 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138 (1967).

**23.** In applying this test, the court should be mindful of the words of the Supreme Court: "Impartiality is not a technical conception. It is a state of mind." *Irvin, supra*, 81 S.Ct. at 1643–44, *quoting United States v. Wood*, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78 (1936).

not tried before a fair and impartial jury. As noted above, after recovering from his heart ailment defendant Smith completed the presentation of his case before the same jury which had recently convicted three of his codefendants of participating in a conspiracy and cover-up centering around illicit activities in Judge Smith's court. Before Smith completed the presentation of his case, the jury had already determined that the charged conspiracy did in fact exist. The jury had also already considered—as permitted by the trial judge's instruction—whether Smith was a member of the conspiracy and whether Smith "knowingly and wilfully" participated in the substantive RICO violation charged in the indictment. Since Judge Smith was at the very heart of the offenses charged, it would have indeed been astounding if the same jury which convicted three of his codefendants had acquitted Judge Smith. A clearer case of jury prejudice is difficult to imagine.

■■■ Adverse pretrial publicity may prejudice a jury panel to such an extent that a fair trial before that panel is impossible. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Similarly, the inadvertent exposure of a jury panel immediately prior to trial to the fact that the defendant was previously convicted in a related case requires disqualification of the panel. Leonard v. United States, 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964); cf. United States v. Carranza, 583 F.2d 25 (1st Cir. 1978) (defendant has right not to be tried by jurors who participated in his conviction in a prior case); Virgin Islands v. Parrott, 551 F.2d 553 (3d Cir. 1977) ("absent waiver it violates the Sixth Amendment guarantee of an impartial jury to use a juror who sat in a previous case in which the same defendant was convicted of a similar offense, at least if the cases are proximate in time"); Lett v. United States, 15 F.2d 690 (8th Cir. 1926) (error for court to allow jurors who had convicted defendant's wife of similar charges on the same day to hear defendant's case when defendant's wife was alleged to have participated in the offense for which defendant was charged). But the prejudicial impact of adverse pretrial publicity or of the jurors' knowledge that the defendant had been previously convicted in a related case pales when compared with the prejudice in the case at bar. The jurors had not simply heard television news reports about the conspiracy which featured Judge Smith as its main character; they had actually heard damaging testimony under oath and the prosecutor's closing argument in a courtroom. The jurors had not simply been told that Judge Smith had been convicted in a prior related case; they had actually considered for themselves whether Smith was a participant in the very conspiracy and substantive racketeering offense for which he was now on trial. Because Smith was such an integral part of the case at bar, it was impossible to cleanse the jury box of bias after three codefendants had been convicted. The jury which convicted Judge Smith was a jury predisposed to find guilt; after convicting defendants Harrell, Riggs and Stratton, the jury was virtually bound to convict defendant Smith.[24]

When the trial judge decided to adopt the unprecedented bifurcated trial procedure in the case at bar, he was undoubtedly motivated by sincere considerations of fairness

24. The government argues that because a jury may consider the guilt of one defendant before they consider the guilt of another, the procedure adopted here was not improper. This argument is clearly without merit. In the case at bar the jury did not merely consider the guilt of defendants Harrell, Riggs and Stratton prior to considering the guilt of defendant Smith. Rather, the jury considered the guilt of Harrell, Riggs and Stratton—and therefore was required to consider the participation of Smith in the crimes charged—before Smith had finished presenting his case. The error committed was not that the jury was allowed to consider the guilt of Harrell, Riggs and Stratton prior to considering the guilt of Judge Smith. Rather, the error was that the jury was prejudiced because it was allowed to consider Smith's participation in the offenses charged before Smith completed the presentation of his defense. Hence, Smith could not present his defense to an "impartial jury." Indeed, had Smith not suffered his heart ailment and had all four defendants' cases gone to the jury at the same time, there would have been no error in the jurors' first deliberating on the guilt of Harrell, Riggs and Stratton, and then considering the guilt of Judge Smith.

and judicial efficiency.[25] But noble motivations do not excuse constitutional error. The novel procedure adopted by the trial court emphasized interests of efficiency at the expense of defendant Smith's right to a fair trial. The trial court's effort to avoid retrying Judge Smith before a new jury, or possibly continuing the entire case until Smith was able to return, requires us to reverse Smith's conviction and remand for a new trial.

Additionally, our careful review of the record in this case convinces us that the absence of Judge Smith prejudiced the effective presentation of the remaining coconspirators' defenses. Because Smith was such a central figure in the conspiracy, allowing the government to try Smith *in absentia* abridged not only Smith's rights, but, under the facts of the case at bar, also abridged the rights of his coconspirators. The entire trial was thus tainted by the bifurcated trial procedure adopted in this case. Although the issue is a close one, we think that under the unique circumstances of this case, the conviction of defendant Riggs must therefore be reversed and remanded along with the convictions of his codefendants.[26]

The reversal of defendant Riggs' conviction is based solely upon the unique facts in the record of this case. The presentation of evidence on defendant Smith's guilt in the absence of Smith and his counsel tainted the entire proceeding since Smith was the central figure in the conspiracy. However, this holding should in no way be read to imply that co-conspirators must be tried together or that the central figure in a conspiracy must testify before a co-conspirator can be convicted. We only hold that under the facts in the case at bar, the presentation of evidence bearing upon the guilt of defendant Smith without the presence of Smith or his counsel prejudiced the case of all defendants.

## V. CONCLUSION: A CASE FOR THE BIRDS

The trial judge in the case at bar was faced with what was indeed an unwieldy case. Various transcripts fill nearly one hundred volumes and well over twenty thousand pages. Other materials, including exhibits, fill another ten large cartons. The trial alone took nearly four months to complete. Understandably, the trial judge made a valiant attempt to serve the interests of judicial economy by trying the entire case before a single jury. But while the judge may have watched judicial economy like a hawk in this case, in doing so he lost sight of the constitutional rights of those on trial. The clearly unconstitutional procedures of ordering a venue change without the consent of all defendants and bifurcating the trial of the main character in the crimes charged compels us to reverse the convictions of each defendant on all counts and remand for a new trial or trials consistent with this opinion. While this result is regrettable in a case which in time has already consumed over half the life span of some hummingbirds and in paper has forced the felling of a number of trees which could have provided fine homes for our feathered friends, we must be careful not to permit concerns of judicial economy and convenience to abridge important constitutional rights. We have used our field glasses to find a procedural *rara avis* on this ornithological expedition, but it is a *rara avis* which would do well to become extinct.

### REVERSED AND REMANDED.

25. After announcing his decision, the trial judge noted that "I feel that this is much fairer than [Smith] having to go through all of this again. I think it is fair. There is a considerable investment by him, by the Government, by everybody else in this trial." Transcript at 11,886.

26. Appellant Riggs argues that the trial court erroneously admitted various hearsay statements of coconspirators. Because we reverse and remand on other grounds, we do not decide the validity of this argument, but simply note that the standard for the admission of such statements was recently discussed by this court in *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

Appellants raise a number of other points which, if valid, would require us to reverse and remand. We do not reach these issues, since we reverse and remand on all counts for all appellants based on other grounds.