NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 28, 2011
Decided August 18, 2011

**Before**

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

| | |
|---|---|
| Nos.  09-1190, 09-1224, 09-1225, 09-1226, 09-1227 & 09-1251 | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 1:03-cr-00090 |
| *v.* | **Ruben Castillo**, *Judge*. |
| BOLIVAR BENABE, JUILAN SALAZAR, JUAN JUAREZ, CHRISTIAN GUZMAN, STEPHEN SUSINKA, and FERNANDO DELATORRE, *Defendants-Appellants*. | |

**O R D E R**

PER CURIAM.  A 2002 investigation of gang violence and activity in Aurora, Illinois ultimately led to the 2008 federal trial and conviction of defendants Bolivar Benabe, Fernando

Delatorre, Christian Guzman, Juan Juarez, Julian Salazar, and Stephen Susinka.[1] All six were convicted of RICO conspiracy, 18 U.S.C. § 1962(d) (Count 1 of the Second Superceding Indictment). Defendants Delatorre and Guzman were convicted of murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(1) (Count 2), and Juarez and Salazar were convicted of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5) (Counts 3 (Salazar) and 4 (Juarez and Salazar)). Delatorre, Benabe, Juarez, and Salazar were convicted of conspiracy to distribute controlled substances, 21 U.S.C. § 846 (Count 9). Delatorre was also convicted of assault with a dangerous weapon in aid of racketeering activity, 18 U.S.C. § 1959(a)(3) (Count 5), murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(1) (Counts 6 and 7), distribution of crack cocaine, 21 U.S.C. § 841(a)(1) (Count 12), and possession of a firearm with an obliterated serial number, 18 U.S.C. § 922(k) (Count 13). After a second round of deliberations, the jury returned a special RICO verdict assigning responsibility for four murders and forfeiture verdicts against Benabe and Delatorre.

Following denial of the defendants' post-trial motions, the court sentenced Benabe, Delatorre, Guzman, Juarez, and Salazar to life imprisonment. The sentencing court imposed a $2,500 fine on Benabe, a $3,000 fine on Delatorre, a $4,000 fine on Juarez, and a $5,000 fine on Salazar. Susinka was sentenced to 20 years' imprisonment and a $2,500 fine. All defendants were sentenced to five years' supervised release.

The defendants have raised a bevy of issues on appeal related to their convictions; only Susinka challenges his sentence. By separate published opinion today, we address the appellants' arguments where a published opinion may be helpful, including their challenges to the district court's grant of the prosecution's motion for an anonymous jury; the absence of defendants Delatorre and Benabe from the courtroom throughout trial; the district court's denial of a motion to suppress out-of-court and in-court eyewitness identifications; the jury instructions issued by the district court; the court's decision to provide only partial transcripts requested by the jury during its deliberations; and the court's handling of post-verdict allegations of juror misconduct. See *United States v. Benabe*, No. 09-1190, — F.3d — (7th Cir. Aug. 18, 2011). The remaining claims raised by the defendants, although not frivolous, are more routine, and we address these issues here. Most relate to the guilt phase of trial. Finding that most arguments lack merit and that one minor error was harmless, we affirm their convictions. Susinka also challenges his sentence, and we modify his sentence to shorten the term of supervised release to three years but affirm his sentence in all other respects.

---

[1] A total of sixteen people were indicted by the grand jury. One individual pled guilty, and one named defendant remains a fugitive. The case against the remaining fourteen individuals named in the indictment was bifurcated into two trials. In a companion opinion also issued today, *United States v. Morales*, No. 09-2863, — F.3d — (7th Cir. Aug. 18, 2011), we resolve the appeals of the seven defendants who were tried and convicted in the second trial.

*Factual Background*

The defendants were all members of the Insane Deuces, a street gang that operated in Chicago, Aurora, and Elgin, Illinois. The Aurora faction is the focus of this case. Additional background facts relating to the organization and acts of the gang are available in today's published opinions, *United States v. Benabe,* No. 09-1190, — F.3d — (7th Cir. Aug. 18, 2011), and *United States v. Morales*, No. 09-2834, — F.3d — (7th Cir. Aug. 18, 2011).

In this, the first of the two trials against the gang, the government presented and the jury heard evidence that in 2002 alone, the Aurora Insane Deuces committed four murders, eleven attempted murders, two solicitations to commit murder, and multiple other shootings. This evidence was presented through eyewitness testimony, cooperating witnesses, secret recordings made by Orlando Rivera (a cooperating gang member), and ballistics evidence. Eyewitnesses who were not in the gang identified the shooters in three murders and/or attempted murders proven at trial, including the identification of defendant Guzman as the shooter in a July 18, 2002 attempted murder and the August 11, 2002 murder of David Lazcano. Five former Insane Deuces, including Rivera, testified against the defendants, recounting the gang's structure, leadership, and membership; its rules and regulations; and providing details of the murders and attempted murders committed by the Insane Deuces. Through search warrants, arrests, or cooperation, the government recovered firearms used in eleven of the sixteen murders and attempted murders, directly linking the Insane Deuces to those shootings.

The jury also heard evidence regarding each of the defendants' positions and responsibilities within the gang, as well as specific acts they committed on behalf of the gang. In brief:

- Defendant Benabe was not from Aurora; he came from the Hamlin Park neighborhood on the northwest side of Chicago and was associated primarily with that faction of the gang. He held a few legitimate jobs as a truck driver and store clerk, but from late 1997 until August 2003 his main "job" was as the de facto head of the gang. (The top two gang members were incarcerated, and Benabe was third in line.) In this role, Benabe redrafted the gang's bylaws, negotiated treaties with rival gangs, advised his incarcerated superiors of the gang's activities, assigned subordinate gang members to their leadership roles, and decided to "rollback" the "Senior" members of the gang to a lower status (that of "Juniors") because additional middle management of the gang was necessary to guide its foot soldiers (the "Shorties").

- In 2002, Delatorre was the "First Seat Shorty," and in this role he was responsible for ensuring that the Shorties went out on "missions" with guns. The jury heard about Delatorre's direct involvement in four murders and five attempted murders. Upon his

arrest he confessed to his involvement in the murder of David Lazcano, the murder of David Morales, and the murder of Erbell Valdez.

- Guzman was an Insane Deuce from at least 2001. From January 5, 2001, to April 4, 2002, Guzman was incarcerated in Illinois, but within months of his release from prison, his fellow gang members were recorded discussing his potential as a leader within the gang. The jury heard evidence that Guzman murdered David Lazcano on August 11, 2002 and attempted two other murders.

- Juarez held various leadership positions within the gang, including "First Seat Shorty" in the mid-1990s and "Governor" of Aurora in the late 1990s. As the First Seat Shorty, Juarez sent Shorties (like Rivera) out on missions to kill rival gang members, and enforced discipline among the Shorties by beating those who were unsuccessful in their missions. In 2002 and 2003, Juarez held the fourth highest rank in the gang and was responsible for overseeing the gang's operations in Aurora and Elgin. He was also part of the "Main Table," the primary governing body of the Insane Deuces. Concerning the gang's day-to-day operations, Juarez continued to help local leaders determine which rival gangs and rival gang members to target. He was also one of the main drug traffickers for the Insane Deuces, providing drugs for other gang members to sell and providing additional profits to the gang so that members could purchase firearms and bail other gang members out of jail.

- From late 1999 to January 2003, Salazar was the "Governor" of Aurora and in this position was responsible for issuing and enforcing the standing order to kill rival gang members. The jury heard evidence that, on August 11, 2002, Salazar ordered the gang's Shorties to kill Latin Kings in retaliation for the death of an Insane Deuce. Responding to that order, Delatorre and Guzman killed David Lazcano, who they erroneously thought was a Latin King. When another member of the Insane Deuces was killed on October 11, 2002, Salazar again handed out guns and issued orders to kill Latin Kings. On October 16, 2002, Delatorre and two other Shorties carried out Salazar's directive by killing David Morales.

  The jury heard Salazar, captured on tape, soliciting additional murders. On August 16, 2002, and again on August 22, 2002, Salazar asked Rivera to kill a particular Latin King, giving Rivera directions to his house. Beginning in September 2002, Salazar plotted to kill John Landeros, an Insane Deuce, because Salazar and others (erroneously) suspected that Landeros was cooperating with police. Salazar asked Rivera to kill Landeros, and he provided Rivera with a gun to use in the murder.

- Susinka was a Shorty in 2001 and 2002, and was responsible for carrying guns and going on missions. On February 12, 2002, Susinka drove Delatorre and Harold

Crowder to murder Robert Perez. Then, on February 23, 2002, Susinka and Delatorre picked up three other Shorties after they tried to kill some suspected Latin Kings. On March 13, 2002, Susinka was arrested with a gun that had been used three days earlier in another attempted murder connected to the Insane Deuces. Two days later, Susinka and Delatorre were themselves victims of a shooting – but, consistent with the code of silence of the Insane Deuces, refused to cooperate with the police investigation. On April 15, 2002, Susinka sold an undercover officer an ounce of cocaine. The next day, Susinka was arrested for possession of a firearm after a struggle with a police officer.

*Analysis*

I.     *Pretrial Issues*

     A.     *Denial of Motions to Sever*

Defendant Guzman, joined by co-defendants Salazar, Juarez and Susinka, argues that the district court erred by refusing to sever his trial from the other defendants in this trial before Judge Castillo. He argues that he was prejudiced because he was a relatively minor player in the conspiracy, because of a *Bruton* issue that arose at trial, and because of Delatorre and Benabe's absence from the trial. We find no abuse of discretion in the district court's decision to include Guzman in this trial.

     1.     *Guzman's Relative Role in the Conspiracy*

Fourteen of the indicted defendants pled not guilty and went to trial. Interests of judicial economy and efficiency weighed against conducting fourteen individual trials, but fairness and practicality weighed against conducting one joint trial. Judge Castillo divided the defendants into two groups:   roughly, into the "alleged leaders of the conspiracy" and the "less major players." Based on the indictment and the government's characterization of the evidence in its pretrial briefs, the judge found that it appeared that Guzman, a Shorty, played a larger role in the alleged conspiracy than the defendants grouped in the second trial as "less major players," and would be tried with the leaders of the conspiracy. Guzman moved to sever his trial, arguing in part that he would be unfairly prejudiced if he were tried with the gang leadership. ("Guzman showed up at a murder trial and a RICO conspiracy broke out." Guzman Br. at 18). His motion was denied.  After hearing the evidence, the jury found Guzman guilty of one murder and of RICO conspiracy. He argues that he was found guilty on these charges only because he was prejudiced by being tried alongside the major players of the Aurora Insane Deuces. We review a district court's denial of a motion to sever under Federal Rule of Criminal Procedure 14 for an abuse of discretion. *United States v. Rice*, 520 F.3d 811, 817 (7th Cir. 2008); *United States v. Coleman*, 22 F.3d 126, 134 (7th Cir. 1994).

"When many defendants are tried together in a complex case and they have markedly different degrees of culpability, [the] risk of prejudice is heightened." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); see also *United States v. Moya-Gomez*, 860 F.2d 706, 765 (7th Cir. 1988) ("Denial of a motion for severance may be an abuse of discretion if there is a great disparity of evidence between the moving defendant and his co-defendants."). But a "simple disparity in the evidence will not suffice to support a motion for severance." *United States v. Caliendo*, 910 F.2d 429, 438 (7th Cir. 1990) (internal quotation omitted). There will inevitably be some differences among defendants tried together. Someone will be first and someone will be last. Half will be below the median.

We do not see a prejudicial disparity of evidence against Guzman as compared to his co-defendants. He was charged with participating in the RICO conspiracy through murdering Lazcano and attempting to murder another victim, and he was charged with additional counts of murder and assault with a dangerous weapon. Most of the evidence presented at trial against his co-defendants would have been admissible in a trial on these charges against him alone. The district court properly instructed the jury to consider the evidence against each defendant individually, and we presume that the jury was capable of following such a limiting instruction. See *United States v. Zahursky*, 580 F.3d 515, 525-26 (7th Cir. 2009); see also *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008) ("[W]e assume that limiting instructions are effective in reducing or eliminating unfair prejudice."). The jury's verdicts show that its members were indeed able to consider the evidence against each defendant individually. For example, Guzman was acquitted of Count 5 (assault with a dangerous weapon in aid of racketeering activity), while Delatorre was convicted of that count. The district court did not abuse its discretion by denying Guzman's motion to sever on the basis of his relative role in the conspiracy.

### 2.    *Bruton Issue*

Guzman also argues that the district court should have granted his motion to sever, and that the court's failure to do so amounted to an abuse of discretion, because of a *Bruton* violation that he argues occurred at trial. Officer Greg Spayth testified on behalf of the government, describing events surrounding the investigation of the Lazcano murder. Delatorre had confessed to being the driver in the murder, and in the confession, he named Guzman as the shooter. The government sought to admit Delatorre's confession against Delatorre through the testimony of Officer Spayth. As required by *Bruton*'s prohibition of permitting one non-testifying defendant's confession to implicate another defendant, see *Bruton v. United States*, 391 U.S. 123, 135-37 (1968), the government stated that it planned to replace Guzman's name with the phrase, "another gang member." At trial, the government asked Officer Spayth:

> Q:    Did Defendant Delatorre indicate if he was alone on August 11, 2002 or was he with someone?

A:      He was with somebody else.

Q:      Who was he with?

Tr. 2219.  Officer Spayth did not answer the question.  Both of Guzman's counsel immediately objected, and the objection was sustained.  No other counsel made an objection.  The jury was instructed that the confession was to be considered only against Delatorre.  The prosecution later explained that if Officer Spayth had he been permitted to answer the question, he would have said "another gang member."  Tr. 2256.

There was no *Bruton* violation.  The Supreme Court has given its blessing to generic responses that do not facially incriminate a particular defendant, and there was no error in the continued reference to "the other gang member" in Officer Spayth's testimony.  See *Gray v. Maryland*, 523 U.S. 185, 196 (1998) (permitting "a few other guys").  True, a *Bruton* violation would have occurred had Officer Spayth answered by naming Guzman.  The government opened the door for a possible *Bruton* violation by failing to ask the question in a leading manner. (This is one of those situations where leading questions are entirely appropriate.) But the door was closed again when Guzman's counsel immediately objected and the court sustained those objections.  The government was on dangerous ground, but no violation occurred.  Guzman argues he was prejudiced because his lawyers – and only his lawyers – stood to object.  But a the jurors were repeatedly instructed, objections by lawyers are not evidence.  *Bruton* was not violated here, and the district court did not abuse its discretion in denying Guzman's motion to sever on the basis of a *Bruton* violation that did not happen.

3.      *Absence of Co-Defendants Delatorre and Benabe*

Guzman argues that the district court abused its discretion in denying his motion to sever because he was unfairly prejudiced by Delatorre's and Benabe's removal from the courtroom unless and until they would promise to behave with appropriate decorum in front of the jury.[2]  The government argues that he forfeited (or, arguably, waived) this argument by not renewing his motion to sever at the close of the evidence.  See Gov't Br. at 74, citing *United States v. Alviar*, 573 F.3d 526, 538-39 (7th Cir. 2009)(discussing waiver of a motion to sever that

---

[2]The circumstances of the district court's extraordinary step of excluding Delatorre and Benabe from the courtroom are described more fully in *Benabe*, No. 09-1190, — F.3d at —.  For purposes of this order, it suffices to say that Delatorre and Benabe engaged in an ill-conceived campaign to obstruct the trial with repeated outbursts, nonsensically declaring that the court and the government had no jurisdiction over them as "sovereign citizens" and "flesh-and-blood human beings," and refusing even to promise to refrain from this behavior in the presence of the jury.

was not renewed at the close of evidence). Guzman has not rebutted the point, so we review this issue only for plain error.

Guzman relies on *United States v. Stratton*, 649 F.2d 1066 (5th Cir. 1981), but the facts in *Stratton* hardly compare to the situation the district court faced here. In *Stratton*, co-defendant Smith, who was the central figure in the charged conspiracy, had a heart attack and was severed from the trial. See *id*. at 1072. Because of Smith's central role in the conspiracy, however, much of that evidence had to do with Smith. The jury found that the conspiracy existed and that three of the five remaining co-defendants were guilty. The same jury later reconvened to decide the case against Smith, finding him guilty of three of four of the counts against him, an outcome the Fifth Circuit found to be "not surprising." *Id*. at 1080. The court remanded the case for a new trial, finding that all the defendants had been unduly prejudiced by the absence of Smith and his counsel from the first trial. *Stratton*, 649 F.2d at 1083.

Unlike the situation in *Stratton*, here Delatorre and Benabe knowingly and voluntarily chose to absent themselves from the courtroom by refusing to promise to conduct themselves with proper decorum. Their counsel remained to participate in the trial, and the jury considered the charges against all of the defendants. The court thoroughly examined potential jurors for any bias they might harbor because of Delatorre's and Benabe's absences. Potential jurors who indicated that they could not remain neutral were excused. At the close of trial, the jury was instructed that it was not to consider Delatorre's and Benabe's absences in any way. The jury was properly screened and properly instructed.

We find no error. As we explain in our published opinion, Delatorre's and Benabe's choices put the district judge in an extremely difficult position – one that he managed superbly. If the judge had left Delatorre and Benabe in the courtroom, the risks of prejudice to the other defendants, including Guzman, were great. See, *e.g.*, *United States v. Mannie*, 509 F.3d 851, 856-57 (7th Cir. 2007). If we were to accept Guzman's theory of prejudice and hold that the other defendants could not be tried at the same time as the absent defendants, we would effectively transfer the power to decide severance issues in complex cases from district judges to the defendants themselves. We affirm the decision of the district court to try Guzman in the first trial along with the gang's major players.

B.      *Denial of Motion for an Unredacted Witness List*

Before trial, Guzman moved for additional discovery seeking the names, addresses and full statements of testifying witnesses to aid in preparation of his defense. In response, the government argued, in reliance on the court's severance order, that it was permitted to temporarily withhold testifying witnesses' names and identifying information for the witnesses' protection until one week prior to the witnesses' scheduled testimony. Guzman's motion was denied. Joined by co-defendants Salazar, Juarez, and Susinka, Guzman argues on appeal that

the redacted statements were insufficient to permit him a meaningful opportunity to prepare a complete defense. He argues that he was prejudiced because the government's case relied heavily on eyewitness testimony, the redacted police reports contained conflicting physical descriptions, and the timing of the disclosure of identifying information did not allow him sufficient time to prepare to cross-examine those witnesses.

We review a court's order regarding pretrial disclosure of information about government witnesses for an abuse of discretion. *United States v. Pearson*, 340 F.3d 459, 468 (7th Cir. 2003), judgment vacated on other grounds, 543 U.S. 1097 (2005). The government provided the defendants with unredacted copies of all cooperating gang member statements and their testimony more than a year before trial. The government also provided to the defense copies of police reports, ATF reports, and redacted versions of the grand jury statements of civilian witnesses more than two years before trial. Only the identifying information of the civilian witnesses was redacted, and only then to protect their safety. Once trial began, the defense received a list of upcoming government witnesses and unredacted statements one week in advance of each witness' testimony. None of the defendants requested additional time to prepare for cross-examination of any of the civilian witnesses.

Although he argues in vague terms that he was prejudiced by the timing of the disclosure, Guzman has not suggested what he might have done differently with additional time to prepare. With the safety of the witnesses in the balance, the district court did not abuse its discretion by permitting the government to withhold the identity of its civilian witnesses until one week before their testimony.

Guzman also argues that withholding the identity of witnesses, particularly witnesses whose testimony might have been contradictory, amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Ordinarily, we review of a district court's decision that evidence need not be produced for an abuse of discretion. See *United States v. Olofson*, 563 F.3d 652, 661 (7th Cir. 2009). Arguing that this issue was not addressed by the district court, Guzman contends that our review should be *de novo*. Under either standard, a *Brady* violation requires a showing that the withheld evidence was favorable to the defense, suppressed by the prosecution, and material to the defense. See *United States v. Are*, 590 F.3d 499, 510 (7th Cir. 2009). Guzman has not identified any such evidence, so we find no error.

C.      *Benabe's Request for a Competency Hearing*

On the day of jury selection, counsel for defendant Benabe moved for a competency hearing. The issue of Benabe's competence to stand trial had not been raised in the two and one-half years following his arraignment. The motion offered no specific factual reason to believe he was incompetent other than his refusal to participate in his defense or to meet with or speak to his attorneys. The court denied this motion:

In the court's view . . . this is a manipulation on his part on the eve of trial to decide to go down an ill-advised route that Mr. Delatorre has raised . . . . Mr. Benabe has very skillfully excused himself from participating in this trial for whatever reason he sees fit, but this is not being done on any type of mental defect that I can perceive . . . . [W]e have a very skillful and a very manipulative defendant here.

A district court must hold a competency hearing if there is reasonable cause to believe the defendant may presently be incompetent, meaning that he is unable to consult with his attorney or to understand the nature of the proceedings against him. 18 U.S.C. § 4241(a); see also *Dusky v. United States*, 362 U.S. 402 (1960). A court's decision whether to hold a competency hearing is discretionary and is reviewed deferentially on appeal. *United States v. Ewing,* 494 F.3d 607, 622 (7th Cir. 2007), citing *United States v. Downs*, 123 F.3d 637, 641 (7th Cir. 1997). We see no reason to disturb the court's decision here. The record shows that Benabe was deliberately trying to block the proceedings. Like the district judge, we have no doubt that Benabe was able to participate in his defense but made a calculated choice not to do so. His refusal to speak with his attorneys or to assist in his defense was simply another misguided attempt to delay the trial. The court's refusal to entertain these tactics was not an abuse of discretion.

II.      *Evidentiary and Other Issues Arising During Trial*

A.      *Admission of "Summary Chart" of Orlando Rivera's Acts of Violence*

Rivera, the prosecution's star witness, was a member of the Insane Deuces who cooperated with law enforcement and then testified about the inner workings of the gang and the violent acts committed by its members in exchange for total immunity. At trial, the court admitted the government's "summary chart" of the "shootings involving Mr. Rivera." The chart included references to incidents Rivera referred to in his trial testimony, but also shootings that he disclosed in police reports and described for the grand jury. The chart began with incidents that had occurred in 1990. It was "adopted" by Rivera the night before he testified about it. Rivera testified that the chart was a "summary of all the shootings that I was involved in from 1990 to 2002" and was "based on the prior statements to law enforcement." The appellants appeal the admission of the summary chart.

Federal Rule of Evidence 1006 provides in part: "The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The rule also requires that the originals be made available for examination to the other parties. But the rule is not an end-run around other rules of admissibility. The underlying records must be accurate and otherwise admissible as evidence for Rule 1006 to apply to a summary of the underlying records. See *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009).

The government concedes, and we agree, that admission of the summary chart was an error under Rule 1006. The chart did not summarize writings, recordings, or photographs, as the rule requires. It was instead a summary of oral testimony that Rivera was prepared to provide. Such a summary is beyond the scope of Rule 1006, despite the prosecution's desire to streamline Rivera's testimony.

The erroneous admission of the summary chart was harmless. See *Chapman v. California*, 386 U.S. 18, 22-24 (1967) (error will be considered harmless if it did not contribute to the verdict); *Oros*, 578 F.3d at 709 (holding that erroneous admission of summary evidence was harmless). We have trouble understanding how such a detailed exposition of the government's cooperating witness's violent acts caused any prejudice to the defendants. The defendants argue, however, that the chart helped the government bolster Rivera's credibility (by emphasizing the dubious attribute that, although Rivera was involved in a terrifying number of shootings, his victims were not killed or seriously injured), while also precluding the defense from attacking Rivera's credibility. We find this argument highly attenuated. The jury was made aware of Rivera's long history of violence and deep ties to the Insane Deuces (including his colorful nickname, "Terminator"). Even if the government's strategy was to paint him as a gang-banger who maimed but did not succeed in killing his victims, this evidence damning the government's star witness could not have caused any prejudice to the defendants.

### B.        *Exclusion of Defense Investigator's Hearsay Testimony*

An investigator for the defense, John Rea, interviewed another Insane Deuce, Luis Lomelli, on March 7, 2008. Lomelli told Rea that he had participated in a shooting with Rivera. According to Lomelli, the two orchestrated a drive-by shooting in Aurora on August 11, 2002, the date of the Lazcano murder. Lomelli reported that Rivera was the driver and Lomelli was the shooter in the drive-by, and that a Latin King, Juan Acevedo, was injured. Lomelli recounted that he used a Mac 10 or 11 with a 30-round clip and shot approximately 15 times. When he testified, Rivera denied being involved in the shooting of Acevedo. He also claimed that when he began cooperating with law enforcement, he stopped his involvement in violent acts.

The defense subpoenaed Lomelli in the hope of impeaching Rivera. Because his testimony would have amounted to a public confession of a serious crime, Lomelli was appointed an attorney and refused to testify. When he invoked his constitutional privilege against self-incrimination, the defense sought to have his hearsay statement introduced through Rea's testimony under Federal Rule of Evidence 804(b)(3) as a statement against Lomelli's interest. The court ruled that the relevant part of the statement was against Rivera's interest, not Lomelli's, so it did not qualify for admission as a statement against the declarant's interest. Instead, finding that it was prohibited under Federal Rule of Evidence 608(b) as evidence of

specific instances of misconduct to attack the credibility of a witness, the court refused to allow the testimony from Rea. All defendants appeal this ruling.

We review the district court's decision to exclude evidence for an abuse of discretion, but we review its interpretation of the rules *de novo*. *United States v. Rogers*, 587 F.3d 816, 819 (7th Cir. 2009). Even if we determine the evidentiary decision was erroneous, we will not reverse it if the jury's ultimate decision was not influenced by the error. *Oros*, 578 F.3d at 707.

Federal Rule of Evidence 804(b)(3) (2008)[3] permits admission of a hearsay statement that:

> at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

For the exception to apply here, the declarant must be unavailable to testify, the statement must be against the declarant's penal interest, and the statement's trustworthiness must be bolstered by corroborating circumstances. *United States v. Bonty*, 33 F.3d 575, 579 (7th Cir. 2004). Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson v. United States*, 512 U.S. 594, 600-01 (1994). When portions of such broader statements implicate someone else (for example, an accused co-conspirator's statements about what another accused conspirator said or did), the statement is considered to have even less credibility than "ordinary hearsay evidence." See *id*. at 601.

Lomelli's overall statement was certainly against Lomelli's interest. He admitted shooting Acevedo. But the relevant portions of his statement were those saying that Rivera had been his driver. *Williamson* expressly rejected the defense strategy here. The court must carefully parse the relevant portions of the statement and cannot admit portions that do not incriminate the declarant. Some self-inculpatory statements can be admitted against accomplices, see *Williamson*, 512 U.S. at 603, but the defendants have not shown that the portions of Lomelli's statement fit into that sort of theory. Because the relevant portions of Lomelli's statement about Rivera's involvement in the August 11, 2002 shooting were not against Lomelli's penal interest, the district court properly refused to admit Lomelli's hearsay statement.

---

[3]Rule 804(b)(3) was amended in 2010. Although the changes are not material to the defendants' argument, we analyze the version of the rule that was in operation in 2008 at the time of the defendants' trial.

C.      *Denial of a Franks Hearing*

During the trial, defendant Juarez asked the court to hold a *Franks* hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), in an effort to suppress some evidence gathered in a search of 1227 Dearborn Street in Aurora pursuant to a warrant. The search was conducted on March 8, 2002, after Juarez was shot. Police officers went to the address of the shooting to investigate. From outside his home, they noticed bullet holes in the house, fresh blood in the rear driveway and on the rear porch, and surveillance cameras on the front of the house pointing towards the street. A search warrant was obtained and executed at the residence later that night. Officers recovered a loaded AR-15 rifle, a shotgun, nearly $20,000 in cash, more than 725 grams of marijuana, two revolvers, and a marijuana growing operation.

At trial, the government planned to call witnesses regarding the shootings and the search of the residence. Citing discrepancies between the investigators' reports and the search warrant affidavit, Juarez objected, and requested that the district court conduct a *Franks* hearing concerning the veracity of the warrant affidavit. (The issue arose in the middle of trial because it was based on information provided to the defense during trial.) The district court denied Juarez's request. Juarez appeals, joined by Guzman, Salazar and Susinka. We review the district court's decision not to hold a *Franks* hearing for clear error. *United States v. McDuffy*, 636 F.3d 361, 364 (7th Cir. 2011).

As we recited in *United States v. Harris*, 464 F.3d 733 (7th Cir. 2006), the Supreme Court held in *Franks* that "the Fourth Amendment requires an evidentiary hearing on the veracity of a warrant affidavit, and ultimately on the constitutionality of the search, when a defendant requests such a hearing and 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and the [ ] allegedly false statement is necessary to the finding of probable cause.'" *Id.* at 738, quoting *Franks*, 438 U.S. at 155-56. *Franks* applies to omissions as well as false statements. See *Harris*, 464 F.3d at 738. A defendant seeking a *Franks* hearing must offer direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had obvious reasons for omitting or falsifying facts. See *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003). Juarez did not make this preliminary showing before the district court.

The "discrepancies" between the search warrant affidavit and the investigating officers' reports raised by Juarez on appeal are minor. The search warrant affidavit stated that a blood trail led either to or from 1227 Dearborn, that the house had been struck by recent gunshots, and that the exterior of the house was under video surveillance and recording equipment had been observed inside. Juarez contrasts these statements with what other on-scene investigators reported: the blood trail led away from the house and a victim probably left the scene by car; the house had been shot at several times and the gunshots might have been old or new; and the

windows of the house were blacked out with plastic and plywood, so that recording equipment could not have been seen. These minor discrepancies do not suggest, however, that any facts were intentionally falsified or omitted.

Even if Juarez had succeed in making the preliminary showing, "the court [would] then consider[ ] the affidavit, eliminating any false statements and incorporating material facts, and [would] determine whether probable cause existed." *Harris*, 464 F.3d at 738. Regardless of which direction the blood trail led, the age of the gunshots, and whether or not the police saw recording equipment through the windows, the police had ample probable cause to search the residence. The district court did not err in refusing to hold a *Franks* hearing.

D.      *Admission of the Rivera Recordings against Susinka*

Susinka was incarcerated on April 16, 2002, before Rivera began surreptitiously recording meetings of the Insane Deuces. Joined by Juarez and Guzman, Susinka argues that the court erred by permitting the recordings to be admitted as evidence against him. According to Susinka, his incarceration effected his withdrawal from the conspiracy. Short of that, he argues that law enforcement effectively thwarted his continued participation in the conspiracy when they arrested him. Under either theory, Susinka believes that the recordings of his co-defendants' statements made after he was arrested could not be used against him without some showing by the government that his participation in the conspiracy was ongoing. We review this evidentiary decision for abuse of discretion. *United States v. Cruz-Rea,* 626 F.3d 929, 937 (7th Cir. 2010).

Contrary to Susinka's argument, incarceration does not necessarily imply a full-stop in a defendant's participation in an underlying conspiracy. See, *e.g.*, *United States v. Turner*, 604 F.3d 381, 388 (7th Cir. 2010) (noting that defendant could be held accountable for quantity of drugs distributed by a conspiracy during defendant's period of incarceration). In this case, for example, the evidence showed that Insane Deuces leaders continued to operate from within prison and that gang members acted to protect one another in prison. To withdraw from a conspiracy, a defendant must take some affirmative act of withdrawal, such as submitting himself to the authorities for prosecution or announcing to his co-conspirators that he is withdrawing. "Simply ceasing to participate even for extended periods of time is not sufficient to show withdrawal." *United States v. Julian*, 427 F.3d 471, 483 (7th Cir. 2005), quoting *United States v. Wren*, 363 F.3d 654, 663 (7th Cir. 2004), judgment vacated on other grounds, 543 U.S. 1101 (2005). Withdrawing from a conspiracy is not easy, and it was Susinka's burden to show that he affirmatively took such action. See *United States v. Hall*, 212 F.3d 1016, 1023 (7th Cir. 2000); *United States v. Bafia*, 949 F.2d 1465, 1477 (7th Cir. 1991).

It was not the government's burden to prove that Susinka did not withdraw. Because Susinka had no evidence that he actually withdrew, the court did not abuse its discretion in

admitting the Rivera recordings as evidence against Susinka as co-conspirator statements made during the course of and in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E).

### E.     *In-Court Identification of Susinka*

Lorenzo Becerra, a former Shorty member of the Insane Deuces, testified for the government pursuant to a grant of immunity. According to Becerra's testimony, Delatorre and "Stevie" sent him on a mission to shoot at Latin Kings after the rival gang's members threw rocks at Delatorre's truck. (Another member of the gang, Brian Hernandez, gave Becerra twelve bullets and told him that he would get a minute's beating for every bullet he did not shoot.) The government asked Becerra, "who is Stevie?" Becerra responded, "Stevie [is] one of the brothers." The government then showed Becerra a previously admitted photograph of Susinka, and Becerra identified it as "Stevie." Susinka did not object to this procedure during trial. On appeal, Susinka, joined once again by Guzman and Juarez, argues that Becerra's in-court identification was improperly suggestive and unreliable.

The government argues that because Susinka failed to move to suppress Becerra's testimony before trial, his argument is waived under Federal Rule of Criminal Procedure 12(e). We disagree. Becerra was identifying Susinka's photo in court. Rule 12 does not demand that a defendant predict the method and reliability of an in-court identification and move to suppress it before trial has even begun.

Susinka's argument has no merit, though. Becerra testified that his eyesight was bad and he could not see long distances. In lieu of identifying the defendants in person (whom he presumably could not see clearly) he identified the defendants by photographs that had been previously admitted as exhibits and that the government presented to him on the stand as he testified. Susinka's photo was one of those. There was nothing improperly suggestive about Becerra's identification of the person in the photo as "Stevie." Any real unreliability in Becerra's identification would have been fodder for cross-examination. It is not a sound basis for appeal. We find no error.

### F.     *Cross-Examination of Susinka*

Susinka testified in his defense. He complains that in cross-examination, the prosecution asked a series of questions that were not in good faith. For example, after Susinka testified that he was not an Insane Deuce, the government asked him whether a list that had been found in his pocket when he was stopped and searched by police on October 7, 2001 was a list of the names of certain Insane Deuces, the dues those members had paid, and the violations that were owed to them. Susinka admitted that he had a piece of paper in his pocket when he was arrested but denied the prosecution's other suggestions. The prosecution did not introduce the

list into evidence, and objections to the prosecution's efforts to elicit further testimony about the list of names from the officer who conducted the search were sustained. In denying Susinka's motion for a mistrial, the court found that the questions were not in bad faith because the list appeared in the officer's report. Susinka, joined by Guzman and Juarez, appeals this ruling, which we review for an abuse of discretion. *United States v. Holt*, 486 F.3d 997, 1000-01 (7th Cir. 2007) (scope of cross-examination reviewed for abuse of discretion).

It is improper for the prosecution to ask a question that "implies a factual predicate which the examiner knows he cannot support by evidence or for which he has no reason to believe that there is foundation of truth." *United States v. Harris*, 542 F.2d 1283, 1307 (7th Cir. 1976). A prosecutor's questions on cross-examination must be based on more than the prosecutor's own suspicions. See *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir. 1990) (prosecutor's insinuation on cross-examination that Mexican traffic ticket serving as defendant's alibi was a sham was improper because questions were based on nothing more than prosecutor's unsubstantiated suspicions). That general rule does not mean that the government has a duty to introduce the factual predicate for a potentially prejudicial question posed in cross-examination. See *United States v. Jungles*, 903 F.2d 468, 478-79 (7th Cir. 1990). By the same logic, it also is not necessary for the government to be prepared to produce independently admissible evidence to support the implications of a question. *Id.*

Here, Susinka argues that the existence of the list could not be supported by evidence. The document could not be produced for introduction at trial because it had not been inventoried anywhere, and the court sustained objections to the government's attempt to elicit testimony about the information contained on the list from the officer who had stopped and searched Susinka. But that officer testified to the existence of the list, as did Susinka. As the district court noted in its ruling, the list was noted in the officer's police report. Susinka does not contest the court's assertion regarding the contents of the police report. We agree with the district court that this notation gave the prosecution good faith to ask Susinka what was on the list.

Susinka also raises a second argument concerning his cross-examination. The prosecution introduced evidence that on March 13, 2002, police observed Susinka throw away a gun while riding his bicycle. A ballistics expert testified that the recovered gun was used in the gang-related shooting of two men in Aurora on March 10, 2002. In cross-examination, the prosecution asked Susinka whether his sister had told him not to leave the house with a gun on March 13, 2002. Susinka denied that his sister had said that. Susinka objected to this line of questioning, but he did not articulate a basis for his objection. Later, in his motion for a mistrial, he denied that he was challenging the government's good faith basis for asking this question. He has forfeited this argument, and our review is for plain error. *United States v. Jaimes–Jaimes*, 406 F.3d 845, 848-49 (7th Cir. 2005) (explaining the difference between waiver and forfeiture and

reviewing forfeited argument for plain error). But Susinka failed to raise a cogent objection to this question at trial, and without one he has failed to show a plain error.[4]

G.    *Closing Argument against Susinka*

Susinka argues that the government denied him a fair trial based on several comments in closing arguments. Juarez and Guzman join Susinka in his contentions that, in its attempt to tie Susinka to the Insane Deuces, the prosecution improperly referred to the missing list, supposedly of gang members, dues, and violations that had been uncovered in a search of his pocket on October 7, 2001, and impermissibly described Susinka's two companions on that date as Insane Deuces without evidence to support those assertions. He also contests the prosecution's rebuttal attack on his credibility and its references to his possession of "nation guns" (*i.e.*, guns belonging to the Insane Deuces) on November 24, 2001 and March 13, 2002. More generally, Susinka contends that the government improperly implied that he was guilty by association.

Susinka failed to object to the government's closing on these bases at trial. We review these points only for plain error. *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003); *United States v. Anderson*, 303 F.3d 847, 854 (7th Cir. 2002). In essence, the issue here is whether it was a plain error for the district court not to have granted a mistrial on its own initiative, in the absence of a timely objection. See *United States v. Tanner*, 628 F.3d 890, 898-99 (7th Cir. 2010). This is a very demanding standard, and appropriately so. Consider the possibility, for example, that a defendant and his lawyer feel the trial has gone as well for them as possible. A retrial would allow the prosecution to correct its mistakes and tighten its case, and would subject the defendant to the time, stress, and expense of a second trial. Defense counsel in such a case might prefer at most to raise an objection to an improper comment in closing argument, but

---

[4]When Susinka was testifying, his counsel objected but did not state specific grounds. In his reply brief, Susinka asserts that this argument was preserved. He cites the record as follows: "[When] asked if challenging that good faith, counsel for Susinka answered 'I am.'" Susinka Reply at 12. This misstates the record. The passage came in a bench conference during which Susinka's lawyer moved for a mistrial. After counsel for Susinka stated "I am," the court asked Susinka's lawyer to clarify whether he was generally objecting to the question being asked, or whether he was objecting specifically to the prosecution's good faith basis for asking the question. The court then asked again, "are you challenging their good faith basis?" Defense counsel conferred, and then Susinka's lawyer responded, "Judge, I don't have a specific recollection. I made my objection. That's all I'll say." After the failure to state a ground for the objection during the testimony itself, this response could easily be deemed a waiver rather than forfeiture. Nevertheless, we review Susinka's argument under the plain error standard.

without seeking a mistrial.  This is part of the reason why it is extremely rare for trial judges to order a mistrial in the absence of an objection and motion, especially at the end of a long trial.

When evaluating whether the government's comments to the jury reached the level of prosecutorial misconduct, we first examine whether the remarks themselves were improper. *Sandoval*, 347 F.3d at 631.  If improper, we then evaluate the statements in the context of the entire record and determine whether Susinka was deprived of a fair trial.  *Id.*  In so doing, we consider:

> (1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which the prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction.

*Id.*, quoting *Anderson*, 303 F.3d at 854.  Where the defendant fails to object to the remarks at the time they were made, the plain error standard additionally requires that the defendant "establish 'not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks.'"  *Id.*, quoting *United States v. Durham*, 211 F.3d 437, 442 (7th Cir. 2000).

Even if some of the prosecutor's comments about Susinka misstated the record or otherwise were improper, we find no plain error.  The judge took steps to protect against such errors, giving the standard jury instruction that advised the jury members not to consider the attorneys' arguments as evidence and to trust their own memory and view of the evidence.  The court went further, instructing the jury that gang membership, by itself, was not a violation of the law and that the jury should confine itself "to considering the charges in this case, and you should not find yourselves emotionally swayed by the use of the word 'gang' or 'Insane Deuces.'"  Susinka has not presented any basis from which we might conclude that the jury did anything other than follow the instructions it was given.   In addition, the weight of the evidence amply supported Susinka's conviction.  Although the prosecution arguably made some missteps in what was a long closing argument at the end of a long and complex trial, there was no timely objection, and we find no plain error here.

The situation is a little different with the prosecution's statement in closing that Susinka had a "gang list that talked about violations and names of participants at meetings."  There was no immediate objection.  During the next recess, however, after the government had finished the opening portion of its argument, Susinka himself raised an objection with the court, pointing out correctly that the list was not in evidence.  The court told Susinka that his lawyer could make that point in his closing argument, and that was exactly what happened.

We review the court's handling of this problem under an abuse of discretion standard. *United States v. Ochoa-Zarate*, 540 F.3d 613, 616-17 (7th Cir. 2008). The government concedes that this portion of its argument was improper because the list was not in evidence, but Susinka was not denied a fair trial. Susinka's counsel was able to rebut the government's assertion by reminding the jury that, "there's no list in evidence. There's no list with any writing on it or any information for you to consider. . . . Because the government says something is so doesn't make it so." The court properly instructed the jury to decide the case on the evidence and that the lawyer's statements were not evidence. And, a great deal of evidence supported Susinka's conviction. There was no abuse of discretion in handling the problem this way and declining to grant a mistrial on the court's own motion.

III.     *Sufficiency of the Evidence*

A.     *Guzman*

Guzman argues that the evidence was insufficient to support his conviction on Count 1, the RICO conspiracy. To resolve this challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the government and defer to the credibility determinations made by the jury. We will overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010).

Guzman's argument is based on a mistake as to what the government needed to show in order to prove his guilt for the RICO conspiracy. Guzman contends that the government had to prove that he participated in the conspiracy by committing at least two predicate acts of racketeering. In furtherance of this argument, he concedes that the Lazcano murder would be sufficient to establish one of those acts, but argues that because he was acquitted of Count 5 (assault with a dangerous weapon), that predicate act cannot support his conspiracy conviction. But, it was not necessary for the government to prove that Guzman himself committed two or more racketeering acts. As we explain in the discussion of jury instructions in the published opinion, to prove Guzman guilty of conspiracy, the government needed to prove that Guzman knowingly conspired to participate in the conduct of a racketeering enterprise (here, the Insane Deuces), and that he agreed that someone in the enterprise would commit at least two predicate acts of racketeering. See 18 U.S.C. § 1961(1), (5) (defining "pattern of racketeering activity); 18 U.S.C. § 1962(c), (d) (criminalizing a conspiracy of a pattern of racketeering activity); *Salinas v. United States*, 522 U.S. 52, 65 (1997) ("The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.").

The government presented sufficient evidence from which the jury could find Guzman guilty. Several cooperating gang members testified to Guzman's involvement in the gang as a Shorty. The jury heard a recording of an Insane Deuces meeting on July 5, 2002 at which the members in attendance discussed Guzman's leadership potential (describing him as "ready to go"). Eyewitnesses identified Guzman as the shooter in an attempt to murder a Latin King on July 18, 2002. The jury also heard three eyewitnesses testify dramatically that, on August 11, 2002, Guzman walked up to the passenger side of a car and murdered Lazcano by shooting him three times in the head. The jury heard Rivera testify that he met with Guzman on the day of the Lazcano murder and that Guzman admitted to being the shooter.

> B.    *Susinka*

Susinka makes the same mistaken argument. The record is replete with evidence from which the jury could have found that Susinka was part of the conspiracy. Susinka was a Shorty. He was repeatedly arrested with other members of the gang. When gang leadership ordered the murder of Robert Perez, Susinka drove Crowder and Delatorre to carry out the order. Susinka and Delatorre picked up three Shorties after they attempted to murder Latin Kings on February 23, 2002, and less than a month later, Susinka was arrested in possession of a "nation gun." Susinka himself was the victim of a shooting, and, in keeping with the gang's code, he refused to give a statement to the police. He was photographed attending a meeting of the Insane Deuces on April 10, 2002, and then, less than a week later, was arrested with another firearm connected to the Insane Deuces. Susinka attempts to brush off this evidence as acts and events unrelated to the charged conspiracy, but the jury had ample evidence to find that he was a member of the charged RICO conspiracy.

Susinka also contests the sufficiency of the evidence related to the two predicate acts required to uphold the charge of RICO conspiracy. He argues that the two acts charged against him as part of his RICO conspiracy (the murder of Robert Perez and dealing in narcotics) cannot support his guilt because the jury found the murder not proven and the government dropped the drug conspiracy allegation. As explained above, however, on the RICO conspiracy charge, the government needed to prove only that Susinka agreed that some member of the conspiracy would commit two predicate acts of racketeering. See *Salinas*, 522 U.S. at 64-65. The record fully supports his agreement to the commission of at least two predicate acts of other members of the conspiracy. His conviction for RICO conspiracy was supported by sufficient evidence.

IV.    *Sufficiency of the Indictment and Constitutionality of the RICO Statute*

Susinka, joined by Guzman and Juarez, argues that the second superseding indictment was defective because it failed to cite "the elements of the types of racketeering activity agreed to." Susinka did not move to dismiss the indictment before trial on this ground, and thus has

waived this argument under Rules 12(b)(3)(B) and 12(e).[5]  Even on the merits, however, we would disagree with Susinka's assessment of the indictment.  The indictment charged the elements of a RICO conspiracy under 18 U.S.C. § 1962(d), tracking those elements in Count 1.  We also would find that it provided Susinka with sufficient facts to inform him of the conduct at issue.  In short, contrary to Susinka's argument, the indictment was sufficient.  See *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010).

Joined again by Guzman and Juarez, Susinka argues that he was unconstitutionally convicted because the RICO enterprise proven at trial did not have a substantial effect on interstate commerce "due to its exclusive intrastate, non-economic nature."  We review this argument for plain error; Susinka forfeited it by not raising it below.  See *Jaimes-Jaimes*, 406 F.3d at 848-49.  The government introduced evidence that it had recovered from members of the gang eighteen firearms that had been manufactured outside of Illinois, and that the cocaine sold by the gang members – including Susinka – also came from outside of Illinois.  The court instructed the jury that it was required to find that "the activities of the Insane Deuces street gang would affect interstate or foreign commerce" in order to find the defendants guilty of RICO conspiracy.  When it found the defendants guilty of RICO conspiracy, therefore, it found that the evidence proved beyond a reasonable doubt that the defendants had participated in an illegal enterprise engaged in and affecting interstate and foreign commerce.  We find no error.

V.     *Cumulative Error*

Joined once again by Guzman and Juarez, Susinka contends that he should receive  a new trial due to cumulative errors by the district court.  To demonstrate cumulative error, Susinka must establish that "(1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial."  *Alvarez v. Boyd*, 225 F.3d

---

[5]In reply, Susinka asserts without citation to the record that although he did not contest the sufficiency of the indictment before the district court, his co-defendant Lionel Lechuga did.  This is correct, Dkt.  532, but it does not relieve Susinka from waiver.  Lechuga was not tried with Susinka, and he moved to dismiss the indictment against him after the district court entered its order severing the defendants into two groups for trial.  The severance order stated: "*once the case is called for trial*, any objection, motion, or other application for relief made by any defense counsel orally or in writing shall be deemed adopted and joined by every other defendant, respectively, without announcement by counsel to that effect, and the rulings of the Court shall be deemed applicable to each defendant unless otherwise stated at the time the ruling is made." Dkt. 526, Attach. A, ¶ 8 (emphasis added).  Susinka cannot rely on Lechuga's post-severance motion to preserve a challenge to the sufficiency of the indictment.

820, 824 (7th Cir. 2000). We review to determine if "the effect of the errors, considered together, could not have been harmless," or "[p]ut another way . . . that but for the errors, the outcome of the trial probably would have been different." *Id*. at 825. But, if there are no errors or a single error, there can be no cumulative error. See *id.* Susinka does not meet the necessary threshold and is not entitled to relief under a cumulative error theory.

VI.     *Susinka Sentencing Issues*

Susinka was sentenced to twenty years in prison followed by five years of supervised release. He raises several arguments in appeal of his sentence, only one of which has merit. We begin there. Susinka was convicted of a Class C felony (18 U.S.C. § 3559(a)(3)), and 18 U.S.C. § 3583(b)(2) establishes a maximum term of three years for supervised release for Class C felonies. The government concedes the point. We must modify Susinka's sentence to reduce the supervised release term to three years.

All of Susinka's other arguments regarding his sentencing relate to the district judge's consideration of acquitted conduct in determining his sentence for the RICO conspiracy, which was the statutory maximum of twenty years. Although Susinka was convicted of the RICO conspiracy, the jury found that the murder of Robert Perez was not proven as to him. The district judge, however, had "no doubt" that Susinka was the driver in the fatal shooting in which Delatorre and Crowder were the shooters. Regardless of how Susinka frames his arguments, the district judge did not err by considering the murder in deciding his sentence.

Susinka argues first that the court violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (prohibiting sentences beyond the maximum allowed by the facts found by the jury), when it considered his participation in the Perez murder at his sentencing. But *Apprendi* does not apply when the defendant's sentence does not exceed a prescribed statutory maximum for findings made by a jury. See 530 U.S. at 487 n.13. Susinka's sentence did not exceed the twenty years prescribed for RICO conspiracy without further aggravation. See 18 U.S.C. § 1963(a). There was no *Apprendi* problem here.

Susinka also argues that the district court's consideration of his role in the murder of Robert Perez violated the Double Jeopardy Clause of the Fifth Amendment and 18 U.S.C. § 3553(a)(6), which instructs district courts to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. It is well settled that a sentencing court may consider acquitted conduct in determining the applicable guideline range. *United States v. Watts*, 519 U.S. 148, 152-53 (1997). We will not overturn his sentence on these bases.

On the other side of this same coin, Susinka argues that the court was prohibited from considering his role in the Perez murder under the Sixth Amendment and the background note

to U.S.S.G. § 1B1.3, which states: "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." The logic of the argument is not entirely clear, but Susinka contends that the Perez murder was an element of the RICO conspiracy charge. This is incorrect. To prove that Susinka was guilty of RICO conspiracy, the government had to prove that Susinka agreed that a member of the conspiracy would commit two predicate acts of racketeering. See *Salinas*, 522 U.S. at 65-66. One of these predicate acts could have been the Perez murder, but the Perez murder was not a necessary element of Susinka's RICO conspiracy conviction.

In a similar vein, Susinka argues that the standard of proof employed by the court was erroneous. The district court found by a preponderance of the evidence that Susinka participated in the Perez murder. The standard of proof the district court employed was correct. See *United States v. Heckel*, 570 F.3d 791, 797 (7th Cir. 2009) ("a wide range of conduct is relevant at sentencing – including uncharged conduct and charges of which the defendant was acquitted – so long as that conduct is established by a preponderance of the evidence"). Susinka also contends that the evidence presented at trial did not support the court's finding that he participated in Perez's murder or that Susinka was still a member of the Insane Deuces at the time of the murder. The court's conclusions were both on solid ground. Rivera testified to Susinka's participation in the Perez murder and his ongoing role in the Insane Deuces. Susinka does not give us reason to overturn these findings, and we find no error.

Susinka contends that his presentence investigation report improperly assigned six criminal history points to him for his convictions for possession of a firearm and delivery of cocaine in April 2002. Because the prosecution relied on these convictions to establish the pattern of racketeering activity, Susinka believes those convictions were double-counted. Application Note 4 to U.S.S.G. § 2E1.1 specifically allows conduct for which the defendant has been sentenced previously, and which is then charged in the present count of conviction as part of the pattern of racketeering activity, to be counted in the criminal history as a prior sentence under U.S.S.G. § 4A1.2(a)(1). See *Morales*, — F.3d at —. The only requirement for such treatment is that the conviction for the conduct predate the last overt act of the charged conspiracy. Susinka was convicted of cocaine distribution and possession of a firearm in April 2002, and the Insane Deuces' racketeering activity continued well after that.

Susinka also contests the district court's failure to give him a downward departure to give him credit for the 81 months he served between his arrest and incarceration in April 2002 for distribution of cocaine and possession of a firearm and his sentencing on January 20, 2009. U.S.S.G. § 5G1.3 gives a district court discretion to impose a sentence to run concurrently with, partially concurrent with, or consecutive to prior undischarged terms of imprisonment. As established, these 2002 convictions were not double-counted and did not serve as a basis for an increase in Susinka's offense level. Nothing required the district court to grant Susinka a downward departure. Here, the court ordered that the Susinka's new twenty-year federal term

was "to be served concurrent with your current state sentence." In other words, Susinka received both federal and state credit for time served after the federal sentence was imposed, but no more. The district court's intent was clear, and we find no abuse of discretion.[6]

Susinka argues that his twenty-year sentence exceeds the twelve-year limit on sentences for Class C felonies. But, as the government points out, his argument is based on a misapprehension of Title 18. The section on which Susinka relies, 18 U.S.C. § 3559(a)(3), classifies offenses that carry a sentence of less than twenty-five years but more than ten years as Class C felonies, and 18 U.S.C. § 3581(b)(3) authorizes sentences of no more than twelve years for Class C felonies. But 18 U.S.C. § 3559(b) states that notwithstanding the classification of offenses in subsection (a), "the maximum term of imprisonment is the term authorized by the law describing the offense." And 18 U.S.C. § 1962(d), the RICO conspiracy statute under which Susinka was charged and convicted, carries a maximum term of imprisonment of twenty years under 18 U.S.C. § 1963(a).

Finally, Susinka argues that the twenty year sentence is substantively unreasonable under the 18 U.S.C. § 3553(a) factors. We disagree. The district court properly considered Susinka's involvement with the Insane Deuces, his willingness to participate in acts of violence, his ongoing refusal to accept responsibility for his acts or his membership in the Insane Deuces, and the fact that the guideline sentencing range was life in prison. The court's sentence of twenty years in light of these factors was well within reason.

Susinka further argues that imposition of a $2,500 fine was unreasonable because he has been incarcerated since April 2002 and does not have the ability to pay. The guidelines range for a fine was $25,000 to $250,000. In imposing a much lesser fine on Susinka, the court recognized that Susinka would be incarcerated for a long time but that while incarcerated he would be working and generating some income. The below-guideline fine was reasonable.

*Conclusion*

We modify Susinka's sentence to reduce the supervised release term to three years. In all other respects, we affirm the convictions and sentences of the defendants.

Affirmed as modified.

---

[6]We also reject Susinka's argument that the district court was required to specifically respond to his request for a downward departure. Susinka's argument was facially meritless. The district court did not err in rejecting it without comment.